**HADSON GAS SYSTEMS, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION.**

No. 88–1028.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1989.

Decided June 2, 1989.

Philip M. Marston, for petitioner.

Timm Abendroth, Atty., F.E.R.C., for respondent. Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Washington, D.C., Sol., F.E.R.C., were on the brief for respondent. Joanne Leveque, John N. Estes III, and Frank R. Lindh, Washington, D.C., Attys., F.E.R.C., also entered appearances for respondent.

Dale A. Wright, Robert H. Benna, Terence J. Collins, Washington, D.C., and Margaret L. Bollinger, Houston, Tex., entered appearances, for intervenor, Tennessee Gas Pipeline Co.

Michael J. Manning and James F. Moriarty entered appearances, for intervenor, Tennessee SGS Customers Group.

William H. Penniman and James M. Bushee, Washington, D.C., entered appearances, for intervenor, Process Gas Consumers Group.

James J. Stoker III, Arnold H. Quint, Washington, D.C., and James F. Bowe, Jr., Tamaqua, Pa., entered appearances, for intervenor, Long Island Lighting Co.

Richard A. Solomon and David D'Allessandro, entered appearances, for intervenor, Public Service Com'n of the State of N.Y.

Gary E. Guy entered an appearance, for intervenor, Equitable Gas Co.

William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, Brooklyn, N.Y., entered appearances, for intervenor, Consolidated Edison Co. of New York, Inc.

John W. Glendening, Jr. and Bruce B. Glendening, Washington, D.C., entered appearances, for intervenor, Berkshire Gas Co., et al.

Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges, and

RE,* Chief Judge, U.S. Court of International Trade.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The Federal Energy Regulatory Commission (FERC or the Commission) approved a tariff filed by Tennessee Gas Pipeline Co. (Tennessee) that requires shippers of natural gas to disclose to Tennessee, at the time of contracting for transportation, the names of the ultimate end-users of the gas to be transported on the pipeline. Petitioner Hadson Gas Systems, Inc. (Hadson), a gas marketing company, asserts that the Commission failed to provide a reasoned basis for approving this requirement. Hadson also claims that disclosure of end-users' identities is anticompetitive and inconsistent with another Commission ruling. For the reasons discussed herein, we deny Hadson's petition for review.

### I.

This case arises in the context of an ongoing restructuring of the natural gas industry. In the past, natural gas pipelines operated primarily as gas merchants, buying gas from producers at the wellhead and reselling to local distribution companies (LDCs) and large end-users. *See Associated Gas Distribs.. v. FERC*, 824 F.2d 981, 993 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) (AGD). Under the old regime, pipelines often refused to transport gas for third parties where doing so would displace the pipelines' own sales. *See id.* In Order No. 436, the Commission found this practice unduly discriminatory and generative of serious market distortions; FERC therefore "unbundled" pipelines' transportation

and merchant roles by requiring pipelines to provide non-discriminatory transportation for their shipper-competitors. 50 Fed. Reg. 42,408 (1985) (codified at 18 C.F.R. Parts 2, 157, 250, 284, 375 & 381 (1988)), *aff'd in part and vacated and remanded in part,* AGD, 824 F.2d 981.[1]

Around the time it issued Order No. 436, FERC instituted a "first-come, first-served" formula for allocating pipeline transportation capacity among shippers seeking to use the new open-access transportation service. *See El Paso Natural Gas Co.*, 35 F.E.R.C. ¶ 61,440, at 62,061 (1986), *order on reh'g*, 38 F.E.R.C. ¶ 61,008 (1987), *pet. for rev. filed sub nom. Mobil Oil Co. v. FERC*, No. 87–4016 (5th Cir. Jan. 12, 1987), *FERC's motion for voluntary remand granted, id.* (Sept. 10, 1987), *order on remand,* 41 F.E.R.C. ¶ 61,039 (1987), *order on reh'g*, 44 F.E.R.C. ¶ 61,226 (1988), *pet. for rev. filed sub nom. Hadson Gas Systems, Inc. v. FERC*, No. 88–1723 (D.C.Cir. Oct. 4, 1988) (held in abeyance pending outcome of this case). Under this formula, once a pipeline and shipper contract for a portion of the pipeline's transportation capacity, no later-contracting shipper may be given priority over the first shipper. *Id.*

A shipper may contract for two types of transportation: firm service and interruptible service. A contract for firm service guarantees that a certain capacity will be available to the shipper at a certain time. An interruptible service contract, in contrast, does not guarantee fixed capacity at a set time, but ensures only that transportation will be provided "as available," subject to firm service contracts.

When a pipeline chooses to become an "open-access" transporter under Order No. 436, it must file a tariff with the Commission; the tariff contains the operational conditions which govern the pipeline's

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

1. Order No. 436 imposes an "open-access" requirement on any pipeline that obtains a "blanket certificate" to transport gas (*i.e.*, a certificate authorizing transportation service generically without requiring individual certification for

each transportation arrangement) pursuant to section 7 of the Natural Gas Act, 15 U.S.C. § 717f (1982), or that actually provides transportation pursuant to section 311 of the Natural Gas Policy Act, 15 U.S.C. § 3371 (1982). 18 C.F.R. §§ 284.8(b), 284.9(b) (1988); *see AGD*, 824 F.2d at 996–97.

transportation service. FERC has used individual tariff filings to develop standards regulating capacity allocation under the first-come, first-served system. *See AGD*, 824 F.2d at 1005–07 (finding challenge to FERC's case-by-case development of standards unripe for review).

At issue in this case is whether an open-access pipeline may require a shipper to disclose, at the time the shipper contracts for interruptible service, the names of the end-users of gas to be transported on the pipeline. FERC first approved such a disclosure requirement in *El Paso*.[2] In that case, the Commission explained that disclosure of end-users' names checked against abuse of the first-come, first-served system by ensuring that a shipper's priority was based on a specific transaction. Absent an effective check, a shipper that "failed to assess realistically the amount of gas to be shipped" could request and receive more capacity than it needed, thereby tying up the pipeline when other shippers could be using it; furthermore, without end-user identification, a shipper purposely could request excess capacity in order to broker that excess to other shippers waiting in line for service, thereby allowing those shippers to jump ahead of others in the transportation queue. 35 F.E.R.C. at 62,065.

In this case, Tennessee's tariff included a similar disclosure requirement for shippers seeking interruptible service:

> If the gas to be transported is not for Shipper's system supply, then on or before the date the Transportation Contract is executed Shipper shall (i) identify the name of the corporate entity or entities which will ultimately receive the gas to be transported and (ii) provide verification that the identified end-users have executed sales contracts related to the

transportation services to be provided under the Transportation Contract.

The Commission approved Tennessee's disclosure requirement without comment. *Tennessee Gas Pipeline Co.*, 40 F.E.R.C. ¶ 61,194, at 61,634–35 (1987). Hadson sought rehearing, arguing that disclosure of end-users' names would be anticompetitive, that Tennessee was not required to report the end-user information to FERC and so did not need the information from Hadson, and that the Commission's concern about shippers' requesting excess capacity could be addressed in a competitively-neutral manner by a "use-or-lose" or a "no bump" rule.

Under a "use-or-lose" rule, a shipper that is not fully utilizing the capacity for which it contracted as that capacity becomes available loses its contractual right to the excess capacity, and must go to the end of the queue if it later wants to increase its capacity. Under a "no bump" rule, if a shipper is not using all its capacity, the shipper next in line may utilize the excess capacity; the first shipper does not go to the end of the queue, but may utilize the excess capacity only after the second shipper ceases to use it—*i.e.*, the first shipper may not "bump" the second shipper off the pipeline when the first shipper is ready to utilize the excess capacity.

On rehearing, the Commission rejected Hadson's arguments, citing its earlier decisions in *El Paso* and *Texas Eastern Transmission Corp.*, 41 F.E.R.C. ¶ 61,015 (1987):

> "Permitting the identity of ... end-users to be disclosed at the time of contracting rather than when a request is made strikes an appropriate balance between the need to protect competitively sensitive information and the need to ensure that shippers do not request more capaci-

---

2. FERC has approved the same disclosure requirement in a string of cases after *El Paso*. *See, e.g.,* Natural Gas Pipeline Co. of Am., 39 F.E.R.C. ¶ 61,153, at 61,600 (1987); United Gas Pipe Line Co., 39 F.E.R.C. ¶ 61,152, at 61,578 (1987); Northwest Pipeline Corp., 39 F.E.R.C. ¶ 61,109, at 61,398 (1987); Ozark Gas Transmission Sys., 39 F.E.R.C. ¶ 61,105, at 61,365–66 (1987); Northern Border Pipeline Co., 39 F.E.R.C. ¶ 61,104, at 61,351–52 (1987); Trailblazer Pipeline Co., 39 F.E.R.C. ¶ 61,103, at 61,330–31

(1987); Trunkline Gas Co., 39 F.E.R.C. ¶ 61,100, at 61,299 (1987); Phillips Gas Pipeline Co., 39 F.E.R.C. ¶ 61,012, at 61,036 (1987); Kentucky West Virginia Gas Co., 38 F.E.R.C. ¶ 61,262, at 61,894 (1987); Consolidated Gas Transmission Corp., 38 F.E.R.C. ¶ 61,150, at 61,409 (1987); Transwestern Pipeline Co., 38 F.E.R.C. ¶ 61,061, at 61,170 (1987); Northern Natural Gas Co., 37 F.E.R.C. ¶ 61,272, at 61,823 (1986); Texas Eastern Transmission Co., 37 F.E.R.C. ¶ 61,260, at 61,681, 61,684 (1986).

ty than required to perform a specific transaction."

41 F.E.R.C. ¶ 61,310, at 61,813 (1987) (quoting *Texas Eastern*, 41 F.E.R.C. at 61,025).[3]

Hadson then petitioned for review.

## II.

Hadson advances essentially three arguments: (1) FERC's orders are internally inconsistent, or at least inappropriately redundant, because Tennessee's "no bump" rule serves the same purpose as the disclosure requirement; (2) the disclosure requirement is anticompetitive; thus, by approving that requirement, the Commission disregarded its duty to promote a free and competitive gas market; and (3) the disclosure requirement is inconsistent with a separate ruling of the Commission, Order No. 497. We find none of these arguments persuasive, and therefore deny Hadson's petition for review.

A. *Whether Tennessee's "No Bump" Rule Makes the Disclosure Requirement Unnecessary*

Hadson argues first that the end-user disclosure requirement is unnecessary because Tennessee's no bump rule achieves the same end. In its initial order and its order on rehearing, FERC approved Tennessee's replacement of its use-or-lose provision with a no bump rule, observing that they both operate to "ensure that shippers do not request more capacity than needed to perform a specific transaction." 40 F.E.R.C. at 61,641; *see also* 41 F.E.R.C. at 61,819. The Commission further elaborated that "the no bump provision will serve the purpose of [preventing] a shipper [from] tying up limited capacity by requesting more capacity than needed." 40 F.E.R.C. at 61,641. Yet in its order on rehearing, and in the face of its declarations about the no bump provision, the Commission also declared the end-user disclosure requirement necessary " 'to ensure that shippers

do not request more capacity than required to perform a specific transaction' " and "to ensure that the request is for a specific transaction." 41 F.E.R.C. at 61,813 (footnote omitted). Hadson argues that the Commission's own statements demonstrate the redundancy of the disclosure requirement and the no bump rule. The Commission's approval of the disclosure requirement, Hadson concludes, therefore lacks a reasoned basis.

Looking at this case in isolation, FERC's orders, we acknowledge, convey the impression that the no bump rule serves the same purpose as the disclosure requirement, rendering the latter superfluous. The Commission's decision in the seminal *El Paso* case, however, securely corrects that impression. In *El Paso*, the Commission delineated two *separate* problems that could arise with interruptible service contracts. "One is the general problem of a[n] [interruptible] shipper requesting and receiving an entitlement to capacity that exceeds the reasonably foreseeable needs of the transaction." 35 F.E.R.C. at 62,065.[4] Here, the Commission apparently was concerned with the shipper that inadvertently requests too much capacity, thereby tying up the pipeline. The Commission recognized that a use-or-lose rule was one solution to that problem, but decided not to impose such a rule without further consideration. *Id.* The no bump rule, which the Commission in this case found acted much like the use-or-lose rule, 40 F.E.R.C. at 61,641, and the disclosure requirement also prevent a shipper from tying up the pipeline by contracting for more capacity than the shipper can use: under the no bump rule, a second shipper will move in to use the excess capacity; under the disclosure requirement, a shipper cannot order too much capacity in the first place because it must specify the end-user of the gas it intends to ship and present executed sales contracts for that gas.

---

**3.** The Commission restated its determination in *El Paso*, however, that "the identity of end-users served from system supply of intrastate or interstate pipelines or LDCs need not be revealed." 41 F.E.R.C. at 61,813.

**4.** This problem generally should not arise with firm service because shippers pay a reservation charge, which should deter them from ordering excess capacity. *See El Paso*, 35 F.E.R.C. at 62,065.

Thus, if a pipeline has a a no bump rule, an end-user disclosure requirement might be superfluous to prevent a shipper from tying up capacity.[5] *El Paso* recognized a second, "more serious" concern, however, a problem which, FERC indicated, only the disclosure requirement could solve: the problem of the "brokering shipper." The Commission explained in *El Paso:*

Shipper A may not have requested more capacity than is needed for the transaction because it failed to assess realistically the amount of gas to be shipped. Rather, Shipper A may have requested more capacity because it intends to broker for a fee the capacity it has requested to end-users waiting in line for service. If Shipper A were able to do this, the result would be that by buying gas from Shipper A the end-user could jump to the front of the first come/first served line. This would be, were it to occur, an abuse of the first come/first served scheme of allocating capacity.

35 F.E.R.C. at 62,065.

The Commission then stated that a way to prevent brokering is to require each shipper to identify, at the time it executes its transportation contract, the name of the end-users and to provide verification that those end-users have signed sales contracts. *Id.* Because this disclosure requirement prevents the shipper from acquiring any excess capacity to begin with, it ensures that the shipper will not broker.

FERC did not suggest that a use-or-lose or no bump rule would also prevent brokering—and for good reason. With a no bump rule (or a use-or-lose rule), but without a

disclosure requirement, a shipper could order excess capacity and broker the excess up until the time service became available. If the shipper had not succeeded in brokering away its excess capacity by that time, a second shipper would take up the slack, ensuring that the first shipper did not tie up the pipeline, but the first shipper would still have had the chance to broker until that time. Hadson concedes in its brief that "a no-bump rule doesn't really 'prevent' a shipper from *requesting* more capacity than that needed for a specific transaction," but asserts that the no bump rule "does make sure that a shipper requesting such additional capacity *does no harm* to other shippers that are also using the system." Final Brief of Petitioner at 29 n. 19 (emphases in original). What Hadson does not appreciate, or does not concede, is that, by allowing shippers to request more capacity than they can use, the no bump rule permits brokering up to the time service becomes available, and therefore undermines the first-come, first-served system.[6]

■ Thus, we conclude that the Commission had a reasoned basis for approving Tennessee's disclosure requirement. Although the orders on review do not, standing alone, clearly state the rationale for imposing both a no bump rule and an end-user disclosure requirement, we regard those orders, in light of *El Paso,* as tolerably terse rather than intolerably mute.[7]

### B. *Whether the Disclosure Requirement is Anticompetitive*

Hadson also argues that disclosing the names of end-users to Tennessee would be

---

5.   Hadson does not, however, argue the no bump rule is unnecessary in light of the end-user disclosure requirement. We therefore do not consider whether FERC's approval of Tennessee's no bump rule is to any extent infirm.

6.   Hadson also appears to argue, indirectly, that the disclosure requirement is unnecessary because Tennessee's tariff requires shippers to hold "title or the right to acquire title" to the gas shipped. FERC stated in its initial order that this provision would ensure that "a shipper only requests service for a valid and specific transaction." 40 F.E.R.C. at 61,635. Hadson does not explain, however, how this provision would prevent brokering. Hadson specifically fails to rebut the Commission's claim that, with a title

requirement but without an end-user disclosure rule, a shipper could still broker by agreeing to acquire title to the brokeree's gas temporarily, with title reverting to the brokeree after shipment. We therefore are not persuaded that the title requirement eliminates all need for the disclosure requirement.

7.   Hadson characterizes as an ad hoc argument devised by FERC's counsel on appeal the assertion that the disclosure requirement and the no bump rule work "in tandem." Hadson's characterization is refuted by the Commission's delineation of two separate problems in *El Paso* and its indication there that only the end-user disclosure requirement solves the "brokering shipper" problem.

anticompetitive because Tennessee, in its role as gas merchant, could use that information to launch a marketing offensive against Hadson's customers. By approving the disclosure requirement, Hadson asserts, the Commission lost sight of its duty "to facilitate the flow of competitively-priced gas into the hands of gas consumers everywhere." *AGD*, 824 F.2d at 1038. Hadson fails to explain, at the outset, how competition for Hadson's customers from Tennessee would be anticompetitive. Nevertheless, even assuming that Hadson's fears may be legitimate in some instances, we find those fears premature in this case.[8]

Hadson alerts us to two methods by which Tennessee *qua* gas merchant could utilize the end-user information. First, Hadson suggests that Tennessee might pass the end-user information to its marketing affiliate, which could then attempt to lure away Hadson's customers. Second, Tennessee could obtain an "Interruptible Sales Service" (ISS) certificate, which would allow Tennessee itself to sell any gas in excess of the requirements of its "on-system" customers to any end-users, and thereby compete with Hadson directly.

Hadson concedes, however, that Tennessee is not sharing end-user information with its marketing affiliate. Indeed, a FERC regulation expressly prohibits pipelines from sharing this kind of information with their marketing affiliates. *See* Order No. 497, 53 Fed.Reg. 22,139, 22,146, 22,161 (June 14, 1988) (discussed *infra*). The mere suggestion that Tennessee "may be tempted" in the future to violate that regulation and pass the information to its marketing affiliate is insufficient to justify a determination that the Commission disregarded its duty to promote competition. If Tennessee should someday abuse the end-user information, the Commission will be positioned to take appropriate action.

■ Similarly, Hadson concedes that Tennessee does not possess an ISS certificate. Again, Hadson urges us to address a potential problem before the Commission has had a chance to confront it. Should Tennessee apply for an ISS certificate, Hadson is free to intervene in a Commission proceeding and urge FERC's rejection of Tennessee's application or, at least, Commission imposition of conditions to prevent misuse of the end-user information. In short, Hadson's claims here are unripe for review.[9]

## C. *Whether the Disclosure Requirement is Inconsistent with FERC's Rule on Pipelines' Marketing Affiliates*

Finally, Hadson argues that FERC's approval of Tennessee's disclosure requirement is inconsistent with the Commission's final rule regarding the relationship between pipelines and their marketing affiliates, Order No. 497; that order rejected a

---

**8.** At oral argument, Hadson asserted that it would be willing to provide end-users' names to FERC rather than to Tennessee, and that disclosing that information to the Commission would solve the "brokering shipper" problem without revealing competitively sensitive information to the pipeline. Even if this were a workable solution to the brokering problem—a question we do not attempt to answer—Hadson never formally proposed this option to FERC. The Commission cannot be faulted for failing to consider a proposal that was never brought to its attention.

We note, however, that the Commission emphasized in its principal brief that its "approach to this sensitive issue is in no sense beyond reassessment," but is "evolving" as the Commission "gain[s] experience in crafting the tariff provisions that most effectively foster competition and an equitable access to pipeline capacity." Brief for Respondent at 18. Hadson is therefore free to propose in future proceedings solutions Hadson deems preferable for the problems addressed in the orders on review.

**9.** Hadson advised us at oral argument that the pipelines involved in two of the cases held in abeyance pending the outcome of this case possess ISS certificates. *See* Hadson Gas Systems, Inc. v. FERC, No. 88–1322 (filed Apr. 28, 1988) (involving disclosure requirement of Southern Natural Gas Co.); Hadson Gas Systems, Inc. v. FERC, No. 88–1723 (filed Oct. 4, 1988) (concerning disclosure requirement of El Paso Natural Gas Co.). Hadson argues that it therefore would waste judicial resources if this panel failed to resolve this issue now. We refuse Hadson's invitation to prejudge those cases. Because *this case* does not present the issue of whether a pipeline with an ISS certificate may require the disclosure of end-user names from a competing shipper, our opinion on that issue would be purely advisory, in violation of Article III's case or controversy requirement.

proposal to require public disclosure of end-users' names on the ground that the information was competitively sensitive. Order No. 497, however, addresses a situation entirely different from the one in this case. Viewed in its proper context, Order No. 497 is consistent with FERC's approval of Tennessee's disclosure requirement.

When it initially addressed the potential problems arising from the relationship between pipelines and their marketing affiliates, the Commission considered making available to the public pipelines' logs of transportation requests from both affiliated and nonaffiliated marketers, thus to ensure that pipelines were not according their marketing affiliates preferential treatment. The names of end-users would have been included in these requests. Several commenters, however, including the Antitrust Division of the Department of Justice, voiced concern that this information is competitively sensitive and therefore should not be made public. The Justice Department proposed "revising the rule to require disclosure only of transactions involving affiliates," as this is the information "most important for alerting both the Commission and a nonaffiliated marketer as to whether or not undue discrimination may exist." 53 Fed.Reg. at 22,152.

In light of these comments, the Commission's final rule struck a compromise that would allow both affiliated and nonaffiliated marketers to withhold competitively sensitive information while enabling nonaffiliated marketers to determine whether pipelines were favoring their affiliates. That rule requires pipelines to file with the Commission and make available to the public logs of transportation requests made by

affiliated marketers; those logs, however, need not provide the name of the end-user of the gas to be transported, but only the state in which the end-user is located. *Id.* at 22,151–52, 22,162, 22,163. The final rule also requires pipelines to *maintain* the same information on requests from nonaffiliated shippers; it does not, however, require pipelines to make that information available to the public, but only to the Commission, on request, and to parties in Commission proceedings, subject to FERC discovery rules. *Id.* at 22,147, 22,152, 22,-162.

Order No. 497 is thus not pertinent to the issue in this case. It is concerned solely with obtaining data from pipelines to detect discrimination in favor of marketing affiliates, and does not address individual pipelines' tariff requirements. Order No. 497, furthermore, is compatible with the Commission's orders in this case. Under Tennessee's disclosure requirement, the names of end-users would be provided only to the pipeline, and would not be made available to the public. Because Order No. 497 prohibits pipelines from sharing that information with their affiliates and from disclosing it to the public, and because Tennessee does not possess an ISS certificate, we do not currently envision any potential abuse of that information by Tennessee.[10]

CONCLUSION

Tennessee's no bump rule does not render its end-user disclosure requirement unnecessary because only the latter prevents shippers from brokering excess interruptible transportation capacity. Hadson's fears of the disclosure requirement's anti-

---

**10.** Hadson makes an additional argument that, although meritorious, does not affect the outcome of this case. It notes that in addressing the rehearing request of Citizens Gas Supply Corp. concerning the disclosure of end-users' identities under another provision of the tariff, FERC mistakenly asserted that disclosure was necessary because the pipeline was required to report that data to the Commission. *See* 41 F.E.R.C. at 61,813. Hadson correctly notes, however, that pipelines are no longer required to report that information to FERC. *See* 18 C.F.R. §§ 284.106, 284.223(f). Indeed, Order No. 497 makes it clear that pipelines are not

required to disclose the names of end-users of gas transported by nonaffiliated shippers unless the Commission or parties in FERC proceedings request it, and that even in those instances, the pipeline may reveal only the state in which the end-user is located. FERC concedes that it misspoke in the order on rehearing, but correctly states that this rationale was not the basis for rejecting Hadson's objections to end-user disclosure, and was only an alternate ground for requiring end-user disclosure in *El Paso. See* 35 F.E.R.C. at 62,062. FERC's erroneous assertion therefore does not change the result in this case.

competitive effects are premature because Tennessee has not shared end-user information with its marketing affiliate and does not possess an ISS certificate. Finally, FERC's approval of the disclosure requirement is consistent with Order No. 497. We therefore deny Hadson's petition for review.

*It is so ordered.*